## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD T. ESSLINGER, et al.,** | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **HSBC BANK NEVADA, N.A. and** | : | |
| **HSBC CARD SERVICES, INC.,** | : | **No. 10-3213** |
| **Defendants.** | : | |

### MEMORANDUM

**Schiller, J.**                                                    **November 19, 2012**

The parties in this nationwide class action involving individuals who enrolled in debt cancellation and debt suspension products offered by HSBC entities have resolved their dispute. On February 22, 2012, the Court granted preliminary approval of the settlement. Following a fairness hearing on October 1, 2012, the parties now seek final certification of the Class, approval of the settlement, attorneys' fees, and incentive awards. For the following reasons, the Court certifies the Class, approves the settlement, grants incentive awards, and awards attorneys' fees and costs to Class counsel as laid out below.

## I.       BACKGROUND

### A.       Facts

Defendants offer debt cancellation and debt suspension products (hereafter "Plan" or "Plans"). Defendants market these Plans as services that, under specific circumstances such as unemployment or temporary disability, suspend or cancel the required minimum monthly payments due on the credit card accounts associated with the Plans and excuse the cardholders from paying the monthly interest charges and Plans' fees for a limited period of time. (Second Am. Compl. ¶¶

4, 43.) The cost of a Plan is a monthly fee of $1.35 for every $100 of a cardholder's month-ending credit card balance. (*Id.* ¶ 55.) On average, cardholders paid less than $200 for the Plans. (Mem. of Law in Supp. of Mot. for Final Approval of Class Action Settlement and Plan of Allocation [Mem. in Supp.] at 17.)

Plaintiffs argue that Defendants illegally: (1) enrolled cardholders in Plans without their consent; (2) offered and marketed the Plans in a deceptive and unfair manner; and (3) administered claims under the Plans in a deceptive and unfair manner. (Second Am. Compl. ¶ 3.) The Second Amended Complaint outlines ten causes of action, including: breach of contract and fraudulent inducement; unconscionability; violations of the Truth in Lending Act; violations of various state deceptive trade practices statutes; common law fraud; and unjust enrichment. (*Id.* ¶¶ 184-259.)

### B.    Procedural History

On July 2, 2010, Plaintiffs filed a class-action complaint against HSBC Bank USA Inc. and HSBC Card Services, Inc. Plaintiffs filed a First Amended Class Action Complaint on September 16, 2010. On January 27, 2012, Plaintiffs filed a Second Amended Complaint, adding additional parties, including HSBC Finance Corporation (all relevant HSBC-related entities are collectively referred to hereafter as "HSBC").

Defendants HSBC Bank Nevada, N.A. and HSBC Card Services, Inc. filed a motion to dismiss on November 19, 2010. However, before the motion was fully briefed, the Court suspended the case to allow the parties to participate in settlement efforts. The parties filed a Notice of Settlement in July 2011. On January 27, 2012, Plaintiffs submitted a Motion for Preliminary Approval of Class Action Settlement. On February 22, 2012, following a preliminary approval hearing, the Court issued an order conditionally certifying the settlement class, preliminarily

approving the class action settlement, and approving the notice plan. On October 1, 2012, the Court conducted a final approval hearing.

### C.    Settlement Agreement

In the Settlement Agreement, the parties agree to settle six class actions filed against HSBC in 2010 and 2011 relating to the Plans.[1] The Settlement Agreement defines the Class as "All persons in the United States who were enrolled in or billed for HSBC debt cancellation and debt suspension products . . . between July 2, 2004 and" the date of preliminary approval of the settlement, February 22, 2012. (Pls.' Mot. for Prelim. Approval of Class Action Settlement and Mem. of Law in Supp. of Mot. [Mot. for Prelim. Approval] Attach. [Settlement Agreement] at 6.)

Pursuant to the terms of the Settlement Agreement, HSBC agrees to pay $23.5 million, which will be used to pay settlement costs and claims by Class members. (*Id.* at 10.) A Class member who has not previously received a full refund or benefits, who enrolled in a Plan for twelve months or less, and who affirms that he was enrolled without his consent, may claim a settlement award of $30. (*Id.* at 11.) A Class member who submitted a claim for benefits under a Plan but believes that his claim was improperly denied may claim a settlement award of $60. (*Id.*) All other Class members who did not previously receive refunds and who affirm that they are dissatisfied with any aspect of a Plan may claim a settlement award of $15. (*Id.*) In the event that the Class member awards exceed or are less than the balance remaining in the settlement fund, the award amounts will be reduced or

---

[1] In addition to the *Esslinger* case before this Court, the Settlement Agreement applies to: *Colton v. HSBC Bank Nevada, N.A., et al.*, Civ. A. No. 11-3742 (C.D. Cal. filed Apr. 29, 2011); *Samuels v. HSBC Bank Nevada, N.A., et al.*, Civ. A. No. 11-548 (N.D. Ill. filed Jan. 25, 2011); *McAlister v. HSBC Bank Nevada, N.A.*, Civ. A. No. 10-5831 (W.D. Wash. filed Nov. 14, 2010); *McKinney v. HSBC Card Servs., Inc., et al.*, Civ. A. No. 10-786 (S.D. Ill. filed Oct. 12, 2010); *Rizera v. HSBC Bank Nevada, N.A., et al.*, Civ. A. No. 10-3375 (D.N.J. filed July 2, 2010) (the "Actions"). (Settlement Agreement at 1.)

increased on a pro rata basis. (*Id.* at 12.) However, no Class member will receive more than $150. (*Id.*) Any amount remaining after payment of settlement costs and claims will be distributed as a *cy pres* award to charities mutually agreed upon by the settling parties and approved by the Court. (*Id.*)

As a condition of the settlement, the Class members agree to release HSBC from "any and all rights, duties, [and] obligations . . . that arise out of, relate to, or are in connection with any HSBC Payment Protection product . . . or that arise out of or relate in any way to the administration of the Settlement." (*Id.* at 16-17.)

## II.     CLASS CERTIFICATION

### A.     Numerosity, Commonality, Typicality, Adequacy of Representation

Although this Court granted preliminary approval of the Settlement Agreement, there must still be a final determination as to whether to certify the class and grant final approval of the Settlement Agreement. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 797 (3d Cir. 1995). Federal Rule of Civil Procedure 23(a) mandates that four threshold requirements be met for a class to be certified: (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be questions of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *see also In re Life USA Holding Inc.*, 242 F.3d 136, 143 (3d Cir. 2001). These requirements are referred to as numerosity, commonality, typicality, and adequacy of representation.

#### 1.     Numerosity

The first requirement for a class action is that "the class is so numerous that joinder of all

4

members is impracticable." Fed. R. Civ. P. 23(a)(1). While no magic number guarantees that the numerosity requirement is satisfied, a class of more than forty is generally considered sufficient. *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001). HSBC, based on a search of its record, reported over sixteen million Class members, a number which makes joinder impracticable. (*See* Mem. in Supp. at 38-39; Decl. of John L. Rindler in Supp. of Final Approval of Class Action Settlement [Rindler Decl.]; Aff. of Christopher M. Walsh, Esq. Regarding Dissemination of Notice to Class [Walsh Aff.].) Accordingly, the numerosity requirement is satisfied.

### 2.   *Commonality*

The commonality requirement is met when "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009). This "does not require identical claims or facts among class member[s]." *Marcus v. BMW of N. Am.*, 687 F.3d 583, 597 (3d Cir. 2012). Rather, "for purposes of Rule 23(a)(2), even a single common question will do." *Id.*

The commonality requirement is easily met here. All Class members' claims stem from participation in HSBC Plans during a discrete time period. Their claims turn on whether HSBC marketed and administered these Plans in an unfair manner and all members' claims are subject to some of the same defenses, such as whether the claims against HSBC are preempted. Because the named Plaintiffs share multiple questions of fact or law with the other Class members, commonality is present.

### 3.   *Typicality*

The typicality requirement examines "whether the named plaintiff's individual circumstances are markedly different [from those of unnamed class members] or . . . the legal theory upon which

5

the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985); *see also Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994). "The heart of this requirement is that the plaintiff and each member of the represented group have an interest in prevailing on similar legal claims." *Seidman v. Am. Mobile Sys., Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994). "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rise[] to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Marcus*, 687 F.3d at 598.

As explained above, all of the Class members, including the named Plaintiffs, object to HSBC's marketing and administering of the Plans. The claims are predicated on HSBC's standardized marketing and business practices, which were applied in a uniform manner to all cardholders, and standardized language in the Plans' terms and conditions. (Mem. in Supp. at 41-42.) The legal theories for all Class members, that HSBC marketed and administered the credit Plans in a deceptive way, will be the same. Therefore the typicality requirement is met. *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303 (3d Cir. 2005) ("Cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims.").

### 4.   *Adequacy of representation*

This requirement ensures that the named plaintiffs fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The court must be satisfied that: (1) plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation; and (2) the interests of the named class representatives are not antagonistic to other class members. *See In re Warfarin Sodium*

*Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004); *Gen. Motors*, 55 F.3d at 800-01.

In determining whether class counsel is qualified to represent the class, the court considers: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A); *see also Cmty. Bank of N. Va.*, 622 F.3d at 292. The Court believes that Class Counsel possesses the skill, experience, and qualifications necessary to conduct this litigation. For example, Class Counsel negotiated settlements with over ten credit card companies regarding similar payment protection plans, which resulted in Class Counsel having extensive experience with the operation of the Plans and types of claims asserted in this action. (*See* Mot. for Prelim. Approval at 17; *id.* Ex. 3 [Class Counsel Qualifications].) In addition to the firms' relevant experience, the individual attorneys of record also boast an impressive set of qualifications and pertinent class action litigation experience. (*See* Class Counsel Qualifications.) Similarly, Class Counsel performed substantial work and expended great resources becoming familiar with the specific facts and claims at issue here, including researching and drafting the complaints, reviewing informal discovery provided by HSBC, examining applicable federal and state law, and participating in multiple mediation sessions. (*See* Mot. for Prelim. Approval at 24; Mem. in Supp. at 25.)

As to the adequacy of the Class representatives, nothing in the record suggests to the Court that the named Plaintiffs acted in conflict with the Class or failed to vigorously pursue the claims of all Class members. The interests of the Class representatives and Class members are aligned; both assert the same legal claims and theories and seek similar relief stemming from similar conduct by

the same credit card provider. The Court has no reason to believe that any conflicts of interest exist.

**B.      Rule 23(b)**

In addition to meeting the four requirements of Rule 23(a), a proposed class must also qualify under one of the three sub-parts of Rule 23(b). *Warfarin*, 391 F.3d at 527. Here, Plaintiffs seek to maintain this class action under Rule 23(b)(3), which allows for a class action to proceed if "questions of law or fact common to class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**1.      *Common questions of law or fact predominate***

"Predominance is normally satisfied when plaintiffs have alleged a common course of conduct on the part of the defendant." *In re Janney Montgomery Scott LLC Fin. Consult. Litig.*, Civ. A. No. 06-3202, 2009 WL 2137224, at *5 (E.D. Pa. July 16, 2009). As is the case here, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Plaintiffs have alleged a common course of conduct here based on HSBC's actions in connection with its Plans. The dominant question of law is whether HSBC's actions, and its statements about and administration of the Plans, constitute deceptive or unlawful acts. Any other questions of law or fact would be merely tangential to this common, prevailing question. Therefore, this requirement is met.

**2.      *Class action is superior to other methods***

According to Rule 23, the matters to consider in evaluating superiority are: (1) class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun; (3) the desirability of

concentrating the litigation of the claims in a particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). These factors favor maintenance of a class action in this case. With over sixteen million potential Class members, it would be inefficient and costly to maintain separate lawsuits against Defendants based on similar factual predicates and legal theories. Many of the individual claims would also involve relatively small recoveries by the cardholders, with the average Class member having paid less than $200 to participate in a Plan. (*See* Mem. in Supp. at 17.) Likewise, this settlement would dispose of six similar class actions filed throughout the country, promoting efficiency and saving the courts extensive resources. This Court is an appropriate forum, as it possesses subject matter jurisdiction over the claims and personal jurisdiction over the parties. The last factor, manageability, need not be considered since the settlement will avoid trial. *See Amchem*, 521 U.S. at 593 ("Whether trial would present intractable management problems, see Rule 23(b)(3)(D), is not a consideration when settlement-only certification is requested, for the proposal is that there be no trial."). Accordingly, the superiority requirements are met.

C.      **Notice to the Class**

Class members must "have certain due process protections in order to be bound by a class settlement agreement." *In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141, 145 (3d Cir. 2005). In order to satisfy the due process requirements, Class members must receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

Here, the notice program included individual notice in the form of: (1) statement notice delivered to current HSBC cardmembers in their periodic billing statement; (2) email notice

provided to current HSBC cardmembers who elected to receive communications from HSBC by email; and (3) postcard notice mailed to Class members who were current cardmembers but did not receive statement notice or email notice, or Class members who were no longer cardmembers. (Settlement Agreement at 8-9; Walsh Aff. ¶¶ 5, 10, 13; Rindler Decl. ¶¶ 3-4.) These notices contained detailed information about the Settlement Agreement, as required by Federal Rule of Civil Procedure 23(c)(2)(B), including but not limited to: (1) the nature of the action, including the claims made against HSBC; (2) a definition of the Class; (3) the total settlement amount and the individual claims that each Class member would be entitled to; (4) the rights of the Class members, including the rights to opt out, object, file a claim, and appear at the fairness hearing; (5) the binding effect of a judgment on Class members; and (6) places where Class members could obtain more information, including a website and toll-free number. (*See* Walsh Aff. Ex. A [Notice Sent]; Mot. for Prelim. Approval Ex. H [Prelim. Full Notice].)

HSBC reviewed its reasonably accessible account records in order to identify Class members. (*See* Rindler Decl. ¶¶ 3-5.) As a result of the notice program, individual statement notices were sent to over four million Class members, individual email notices were sent to over two million Class members, and postcards were sent to over sixteen million Class members through first-class mail. (Rindler Decl. ¶¶ 3-4; Walsh Aff. ¶ 10.) In addition to individual notice, a notice was published in *USA Today* on June 20, 2012. (Walsh Aff. ¶ 13.)

Considering the extensive individual notice, combined with the widespread published notice, the Court finds that the notice was sufficient to satisfy the requirements of Rule 23 and due process. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir. 1985) ("[F]irst-class mail and publication regularly have been deemed adequate under the stricter notice

requirements . . . of Rule 23(c)(2).").

## III.    FAIRNESS OF THE SETTLEMENT

A federal class action may be settled only with the approval of a court. Fed. R. Civ. P. 23(e). "[T]he district court acts as a fiduciary who must serve as a guardian of the rights of absent class members . . . . [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *Gen. Motors*, 55 F.3d at 785. However, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975); *see also Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir. 1983). The law looks favorably upon class action settlements to conserve scarce judicial resources. *Gen. Motors*, 55 F.3d at 784.

The decision of whether a settlement is fair, reasonable, and adequate is guided by the nine-factor test enunciated in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975). The *Girsh* test directs the court to examine: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater settlement; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation. *Girsh*, 521 F.2d at 157.

### A.    Complexity, Expense, and Duration of Litigation

This factor "captures the probable costs, in both time and money, of continued litigation."

11

*Warfarin*, 391 F.3d at 535-36. This case was filed over two years ago and encompasses a class period stretching back to 2004. The class is composed of over sixteen million HSBC cardholders, which would result in expensive and time-consuming discovery for both parties if the settlement is not approved. Likewise, this case raises complex legal issues, as evidenced in HSBC's November 19, 2010 motion to dismiss, including defenses related to causation and preemption. Absent the settlement, this case could result in significant expenditures on both sides in responding to the pending motion to dismiss, completing discovery, litigating any summary judgment motions, and preparing for a potentially enormous trial with various expert and Class member witnesses. Accordingly, this factor favors settlement.

### B.    Reaction of the Class to the Settlement

This factor gauges whether the class supports the settlement. *Id.* at 536. Silence from the class is generally presumed to indicate agreement with the settlement terms. *Gen. Motors*, 55 F.3d at 812.

Following extensive notice, both general and individual, there were only twelve objections to the settlement filed by Class members, including two that were untimely. (Defs.' Br. in Resp. to Objections and Conditionally in Supp. of Final Approval of Class Action Settlement [Defs.' Br.] at 1.) In addition to the objections received from Class members, the Attorneys General of Hawaii, Mississippi, and West Virginia (collectively referred to as the "AGs") also filed "objections" to the settlement. (*Id.* at 2 n.1.) However, because the AGs are not Class members, they do not have standing to object to the settlement.[2] *See* Fed. R. Civ. P. 23(e)(5) ("Any *class member* may object

---

[2] Acknowledging that the AGs are not Class members, "Plaintiffs do not purport to release the AGs' claims against HSBC." (Mem. in Supp. at 17 n.9.) Because they are not Class members, the AGs may continue to bring claims belonging to their respective states, such as state

to the proposal if it requires court approval under this subdivision (e) . . . .") (emphasis added); *In re Sunrise Secs. Litig.*, 131 F.R.D. 450, 459 (E.D. Pa. 1990) ("As a general rule, only class members have standing to object to a proposed class settlement.").

The Court considered all objections properly made by Class members, and concludes that the issues raised in those objections fail to provide a valid reason for rejecting the settlement. The most common complaint was that the settlement amount was insufficient to compensate the individual objector for his or her estimated losses. While the Court is sympathetic to the objectors' individual experiences, a settlement is, by its nature, a compromise. Considering the legal and factual obstacles that Plaintiffs must surmount to prove their claims, the Class members face a serious risk of recovering nothing without the settlement. Likewise, the fact that the objectors represent a fraction of one percent of the overall Class strongly favors settlement. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 (3d Cir. 1993) ("Less than 30 of approximately 1.1 million shareholders objected. This is an infinitesimal number."); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (concluding that twenty-nine objectors from a class of 281 "strongly favors the Settlement").

---

criminal and regulatory actions. However, the AGs are precluded from bringing claims "in a de facto or de jure representative capacity on behalf of the plaintiffs" in this class action, because doing so would allow Class members to double recover. *See In re Baldwin United Corp.*, 770 F.2d 328, 341 (2d Cir. 1985); *cf. EEOC v. U.S. Steel Corp.*, 921 F.2d 489, 496-97 (3d Cir. 1990) ("Private litigation in which the EEOC is not a party cannot preclude the EEOC from maintaining its own action because private litigants are not vested with the authority to represent the EEOC . . . But when the EEOC seeks to represent grievants by attempting to obtain private benefits on their behalf, the doctrine of representative claim preclusion must be applied."). Class members were adequately represented and given an opportunity to opt out of the settlement. Allowing the Class members to recover under both this settlement and future AG-driven litigations on the basis of the same facts would run counter to well-established class action principles and would discourage settlements, which are strongly favored. *Warfarin*, 391 F.3d at 535 ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged.").

13

### C.        The Stage of the Proceedings and the Amount of Discovery Completed

The third *Girsh* factor considers the current stage of the proceedings and the lawyers'
knowledge of the strengths and weaknesses of their case. "Through this lens, courts can determine
whether counsel had an adequate appreciation of the merits of the case before negotiating." *Gen.
Motors*, 55 F.3d at 813; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) ("This
factor captures the degree of case development that class counsel have accomplished prior to
settlement. Through this lens, courts can determine whether counsel had an adequate appreciation
of the merits of the case before negotiating.").

Class Counsel had ample time and opportunity to assess the merits of this case before it
sought settlement approval. Although no formal discovery occurred in this case, the parties agreed
to voluntarily exchange information, which aided Class Counsel in assessing the merits of the case.
For example, HSBC provided Class Counsel with thousands of pages of documentation concerning
the marketing, selling, and processing of the Plans. (Defs.' Br. at 3; Mem. in Supp. at 25.) Class
Counsel also interviewed HSBC representatives to obtain information regarding the Plans. (Mem.
in Supp. at 25.) In addition to investigating and researching the legal claims and defenses in this case,
Class Counsel also has experience in negotiating other similar payment protection plan class actions,
which would bolster Class Counsel's ability to adequately appreciate the merits of this case. (*See id.*
at 26; Class Counsel Qualifications). Class Counsel also conducted discovery in one of the other six
class actions against HSBC for payment protection products, which contributed to Class Counsel's
familiarity with the claims and products at issue here. (*See* Mem. in Supp. at 25.)

When analyzing this *Girsh* factor, courts also examine whether the settlement resulted from
arm's-length negotiations. *See In re Corel Corp. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa.

14

2003). When the settlement results from arm's-length negotiations, the court will "afford[] considerable weight to the views of experienced counsel regarding the merits of the settlement." *McAlarnen v. Swift Transp. Co., Inc.*, Civ. A. No. 09-1737, 2010 WL 365823, at *8 (E.D. Pa. Jan. 29, 2010); *see also Corel Corp. Sec. Litig.*, 293 F. Supp. 2d at 491 ("Courts generally recognize that a proposed class action settlement is presumptively valid where, as in this case, the parties engaged in arm's length negotiations after meaningful discovery."); *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class."). Settlement discussions included experienced counsel participating in three mediation sessions before a respected and impartial mediator. (Decl. of Jonathan B. Marks ¶ 14.) The settling parties provided the mediator with extensive written submissions, including exhibits and case law. (*Id.* ¶¶ 10-11.) With the aid of the mediator, the parties were able to discuss and analyze key issues of the case. (*Id.* ¶¶ 15-16, 19.) The mediator concluded, after his involved discussions with counsel, that the settlement was a compromise that reflected "the Parties' assessment of the perceived relative strengths and weaknesses of their positions, and the risks inherent in continued litigation." (*Id.* ¶ 22.) The Court finds that the settlement was a result of arm's-length negotiations.

Although Plaintiffs received no formal discovery in this particular case, the informal discovery, Class Counsel's relevant litigation experience, discovery in a related matter, and the parties' arm's-length discussions all favor approving the settlement. *See Cendant Corp. Litig.*, 264 F.3d at 236 (affirming district court's order approving settlement even though "Lead Counsel mainly engaged in only informal discovery"); *In re Schering-Plough/Merck Merger Litig.*, Civ. A. No. 09-1099, 2010 WL 1257722, at *10 (D.N.J. Mar. 26, 2010) (finding that informal discovery, including

discovery from parallel proceedings, favored settlement).

**D.    The Risks of Establishing Liability and Damages**

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *Gen. Motors*, 55 F.3d at 814. Because this factor requires the court "to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement," the more risks that Plaintiffs may face during litigation the stronger this factor favors approving a settlement. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 319 (3d Cir. 1998). In examining this factor, the court may "give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action." *Lachance v. Harrington*, 965 F. Supp. 630, 638 (E.D. Pa. 1997).

Plaintiffs admit that they face difficult factual and legal hurdles in this litigation if the settlement is not approved. (Mem. in Supp. at 27.) For example, Defendants argue that Plaintiffs' claims are preempted by federal law. Plaintiffs concede that at least two courts have found that regulations implemented by the Office of the Comptroller of the Currency relating to payment protection issues preempt state law causes of action that are similar to those advanced in this action. (*See id.*) In addition to its preemption defense, HSBC also claims to have strong defenses to Plaintiffs' claims on the merits, including documentary evidence refuting Plaintiffs' claims that HSBC enrolled cardmembers in the Plans without their consent. (Defs.' Br. at 9-10.)

The risk of establishing damages is often considered in conjunction with the risk of establishing liability. *See Lenahan v. Sears, Roebuck & Co.*, Civ. A. No. 02-45, 2006 WL 2085282,

at *14 (D.N.J. July 24, 2006). Plaintiffs may face considerable hurdles proving the exact damages for a Class with over sixteen million participants. Likewise, HSBC asserts that it would vigorously challenge Plaintiffs' ability to show a causal nexus between HSBC's alleged wrongdoing and the losses sustained by Class members. (Defs.' Br. at 10.) With victory for the Class by no means assured, the Court finds that the risks of establishing liability and damages weigh heavily in favor of approving the proposed settlement.

**E.     The Risks of Maintaining the Class Action Through Trial**

A court may decertify or modify a class at any time during the litigation should the class prove to be unmanageable. *See Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 631 (E.D. Pa. 2004). HSBC argues that certification could be challenged on the basis that individual issues predominate common issues. For example, different Class members enrolled in the Plans by different means, such as by telephone, through mail solicitations, or even allegedly without their consent. (Defs.' Br. at 11.) Therefore, the alleged false statements or specific unfair conduct may vary across the Class. There are also variations in whether Class members filed claims for benefits under the Plans, whether those claims were denied, what each Class member paid for enrollment, and how long each Class member was enrolled. The large size of the Class may also serve as a threat to maintaining certification, with the possibility that the Class might become unwieldy in the future. The risk of decertification is a real possibility here, and thus this factor weighs in favor of approving the proposed settlement.

**F.     The Ability of the Settling Defendants to Withstand a Greater Judgment**

This factor requires the Court to evaluate whether the Defendants "could withstand a judgment for an amount significantly greater than the Settlement." *Cendant Corp. Litig.*, 264 F.3d

17

at 240. HSBC, as a multinational bank with offices in over 88 countries and territories, could conceivably withstand a greater judgment. (*See* Second Am. Compl. ¶ 37.)  However, the mere possibility that HSBC could withstand a greater judgment does not prevent the Court from approving the settlement. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 323 (3d Cir. 2011) ("[W]e agree that, in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement."); *Warfarin*, 391 F.3d 516, 538 (3d Cir. 2004) ("[T]he fact that DuPont could afford to pay more does not mean that it is obligated to pay any more than what the . . . class members are entitled to . . . Here, the District Court concluded that DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement. We see no error here.")

### G.    The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of the Attendant Risks of Litigation

The last two *Girsh* factors assess "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . compared with the amount of the proposed settlement." *Prudential*, 148 F.3d at 322. In conjunction, these two factors ask "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. "Notably, in conducting the analysis, the court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Sullivan*, 667 F.3d at 324.

The settlement provides for $23.5 million to be distributed to the Class, less attorneys' fees

18

and other expenses. Although Plaintiffs do not set forth an exact estimation of the damages they would likely recover if successful (other than to assert that the average cardholder spent less than $200 on the Plans), Plaintiffs discuss the obstacles that must be surmounted before any damages may be awarded. (*See* Mem. in Supp. at 27-30.) Such legal roadblocks, including HSBC's preemption argument, its allegations that causation cannot be established, and its claims that it possesses documentary evidence that will negate Plaintiffs' claims, evidence a risk that the Class could recover a substantially reduced judgment—if any at all. Similarly, the size of the Class and the differing circumstances of each Class member would make damages estimation, and recovery, even more difficult. Therefore, while the exact maximum possible recovery may be unclear, the extensive risks of litigation are not. Because the likelihood of success is deeply in question, these last factors weigh in favor of settlement.

> H.    ***Prudential* Factors**

In addition to considering the *Girsh* factors, courts in the Third Circuit also consider the following factors outlined in *Prudential*:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved–or likely to be achieved–for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323. The Court concludes that none of the *Prudential* factors weighs

against approval and three of the factors weigh in favor of settlement: (1) whether class or subclass members are accorded the right to opt out of the settlement; (2) whether any provisions for attorneys' fees are reasonable; and (3) whether the procedure for processing individual claims under the settlement is fair and reasonable. All Class members were given the opportunity to opt out of the settlement. As discussed in further detail below, the attorneys' fees sought by Class Counsel are reasonable in light of the time and research required in this complicated matter. Lastly, the procedure for processing individual claims under the settlement is fair and reasonable, with clear and concise claim forms made available to all reasonably identifiable Class members. (*See* Mot. for Prelim. Approval Ex. G [Claim Form].)

## I.     Summary of Factors

In sum, all of the *Girsh* and *Prudential* factors are neutral or weigh in favor of settlement, with the exception of whether Defendants could withstand a greater judgment. This Court believes that the settlement represents a fair compromise between two parties seeking to end  litigation whose outcome is murky and uncertain. The settlement, as a product of lengthy negotiation and mediation between experienced attorneys who vigorously represented their clients' interests, will therefore be approved.

## IV.    ATTORNEYS' FEES

### A.     Overview

Under the Federal Rules of Civil Procedure, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). This Court must conduct a "thorough judicial review" of Class

Counsel's request for attorneys' fees. *See Prudential*, 148 F.3d at 333; *Gen. Motors*, 55 F.3d at 819.

Courts in this Circuit employ one of two methods for calculating attorneys' fees in the class action context. The percentage-of-recovery method awards class counsel a fixed portion of the settlement fund, and is generally used in common fund cases. *Diet Drugs*, 582 F.3d at 540. Under this method, courts determine an appropriate fee for class counsel by examining the size of the settlement fund, any objections to the fee request, counsel's skill and efficiency, the complexity of the litigation and the amount of time counsel spent on it, the risk of nonpayment, and awards in similar cases. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).

The lodestar method, normally applied in statutory fee shifting cases, multiplies the number of hours counsel reasonably worked by a reasonable hourly rate. *See Lake v. First Nationwide Bank*, 900 F. Supp. 726, 734 (E.D. Pa. 1995). Because this is a common fund case, the Court will employ the percentage-of-recovery method to determine the amount of attorneys' fees it will award Class Counsel. As suggested by the Third Circuit, the Court will then apply a lodestar cross-check to ensure the reasonableness of the award. *See Gunter*, 223 F.3d at 195 n.1.

### B.      Application of the Percentage-of-Recovery Method

Class Counsel requests $7,654,041.84 million in attorneys' fees and $100,958.16 in costs. (Class Counsel's Appl. for Att'ys' Fees and Costs [Att'y's Fees] at 16.) Applying the percentage-of-recovery method, the Court will award reasonable attorneys' fees in the amount of 30% of the settlement amount, or $7,050,000, and will award Plaintiffs' counsel all costs accrued.

In determining a reasonable percentage fee award, the Third Circuit requires the district court to consider ten factors: (1) the size of the fund created and the number of beneficiaries; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or

fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity

and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case

by plaintiffs' counsel; (7) awards in similar cases; (8) the value of benefits attributable to the efforts

of class counsel relative to the efforts of other groups, such as government agencies conducting

investigations; (9) the percentage fee that would have been negotiated had the case been subject to

a private contingent fee arrangement at the time counsel was retained; and (10) any innovative

settlement terms. *Diet Drugs*, 582 F.3d at 541. These factors should not "be applied in a rigid,

formulaic manner, but rather a court must weigh them in light of the facts and circumstances of each

case." *Moore v. Comcast Corp.*, Civ. A. No. 08-773, 2011 WL 238821, at *4 (E.D. Pa. Jan. 24,

2011).

###### 1.      The size of the fund and the number of beneficiaries

The Settlement Agreement establishes a common fund of $23.5 million and notice has been

disseminated to over sixteen million Class members. The Third Circuit has held that, in some

instances, a large settlement award warrants a decrease in the percentage of the fund the attorneys

can recover for fees. *See Sullivan*, 667 F.3d at 331 n.64. However, "there is no rule that a district

court must apply a declining percentage reduction in every settlement involving a sizable fund." *Id.*

The fact-intensive analysis of the aforementioned ten factors "must trump all other considerations."

*Id.* Ultimately, based on a comprehensive analysis of the factors, the Court finds that a 30% fee, a

reduction from Class Counsel's requested percentage of approximately 33%, is a fair recovery

considering the size of the fund and number of beneficiaries. *See In re Processed Egg Prods.*

*Antitrust Litig.*, Civ. A. No. 08-2002, 2012 WL 5467530, at *3 (E.D. Pa. Nov. 9, 2012) (approving

a 30% fee award for a $25 million settlement).

### 2.   The presence or absence of substantial objections by Class members

Of the twelve Class members who objected to the settlement, only four objected specifically to the attorneys' fees requested. (*See* Maye Moody Objection to Settlement Agreement, July 9, 2012, ECF No. 79; Todd Spann Objection to Settlement Agreement, Aug. 8, 2012, ECF No. 95; Jose Perez Jr. Objection to Settlement Agreement, Aug. 13, 2012, ECF No. 97; Sherry Shahin Objection to Settlement Agreement, Aug. 14, 2012, ECF No. 98.) The minuscule number of objections weighs in favor of this award of attorneys' fees. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (two objectors out of 300,000 class members supports approval of the requested fees).

### 3.   The skill and efficiency of the attorneys involved

As discussed more extensively above, Class Counsel is highly experienced, having successfully litigated and settled several other litigations involving plans similar to those at issue in this case. (*See* Att'ys' Fees at 7; Class Counsel Qualifications.) Such experience contributed to Class Counsel's knowledge of the structure and operation of these types of plans, which in turn reduced the number of billable hours. (*See* Att'ys' Fees at 7.) Similarly, such relevant experience contributed to Class Counsel's ability to effectively settle this litigation. (*See id.*)

The Court's belief that Class Counsel was skillful and efficient is also echoed by the mediator, who worked with the parties for months to negotiate the settlement. The impartial mediator affirmed that "each of the Parties is represented by experienced and competent counsel, willing, if necessary, to litigate the matter to conclusion" and that "counsel for each Party were effective advocates for their clients and effective participants in the effort to reach a settlement that fairly valued the risks and opportunities of each Party." (Decl. of Jonathan B. Marks ¶¶ 18, 20.) Therefore, this factor weighs in favor of the award of attorneys' fees.

### 4.        The complexity and duration of the litigation

Class Counsel spent more than 7,000 hours litigating the relevant six class actions governed by the Settlement Agreement over more than two years. (*See* Att'ys' Fees at 9.) Class Counsel participated in numerous court hearings and mediation sessions, and submitted many well-researched and thorough filings. Likewise, these cases involve complex and novel issues, including numerous defenses raised and the effect the Settlement Agreement would have on non-party Attorneys General. The complexity and duration of the litigations weigh in favor of this attorneys' fees award.

### 5.        The risk of nonpayment

This factor allows courts to award higher attorneys' fees for riskier litigations. *See Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 219 (E.D. Pa. 2011) As the Court discussed in Part III.D, the risk of nonpayment borne by Plaintiffs' counsel, whose fee is contingent on a favorable outcome, was substantial. Two particular risks that could have contributed to nonpayment are Defendants' argument that Plaintiffs' claims were preempted and the difficulty that Plaintiffs could have faced in maintaining class certification. Counsel, in litigating the case, shouldered a significant risk that after thousands of hours and years of work they would be left empty-handed. For these reasons, this factor strongly weighs in favor of the Court's award of attorneys' fees.

### 6.        The amount of time devoted to the case by Class Counsel

As of July 17, 2012 when the petition for attorneys' fees was filed, Plaintiffs' counsel had spent over two years and 7,474 hours litigating the six relevant class actions. This included researching and filing the complaints, participating in multiple mediation sessions, petitioning the Court for preliminary approval, researching Defendants' motion to dismiss, and other preparatory work. After July, counsel expended additional hours researching and drafting the motion for final

approval, preparing for and attending the fairness hearing, and researching and responding to the Court's request for further briefing following the fairness hearing. Such considerable time, which was reasonably spent by Plaintiffs' counsel to prepare for these large and complex class actions, weighs in favor of a 30% attorneys' fees award.

7. *The awards in similar cases*

In the Third Circuit, fee awards in common fund cases generally range from 19% to 45% of the fund. *See Bredbenner v. Liberty Travel, Inc.*, Civ. A. Nos. 09-905, 09-1248, 09-4587, 2011 WL 1344745, at *21 (D.N.J. Apr. 8, 2011). In fact, the Third Circuit has relied on studies that demonstrated that an average percentage fee recovery in large class action settlements is approximately 30%. *See Sullivan*, 667 F.3d at 333. Thus, a fee award of 30% of the total settlement here is reasonable and in keeping with similar precedent. *See McGee v. Cont'l Tire N. Am., Inc.*, Civ. A. No. 06-6234, 2009 WL 539893, at *16 (D.N.J. Mar. 4, 2009) (approving a 22%-31% fee award in a consumer fraud class action); *In re Linerboard Antitrust Litig.*, Civ. A. Nos. 98-5055, 99-1000, 99-1341, 2004 WL 1221350, at *14 (E.D. Pa. June 2, 2004) (citing a Federal Judicial Center study that found that in federal class actions the median attorneys' fee awards was between 27% and 30%).

8. *The value of benefits attributable to Class Counsel*

As discussed above, Class Counsel's relevant experience, especially brokering settlements in cases involving similar payment protection plans, allowed it to more effectively and efficiently litigate this case. There is no contention, by objectors or otherwise, that the settlement could be attributed to work done by other groups, such as government agencies.

9. *Fee that would have been negotiated in contingent fee arrangement*

In private contingency fee cases, lawyers routinely negotiate agreements for between 30%

and 40% percent of the recovery. *See In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 123 (D.N.J. 2012); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000). The Court's award is squarely within this range.

     *10. Any innovative terms of settlement*

   The Settlement Agreement does not contain any particularly innovative terms. Therefore, this factor neither weighs against nor for the proposed fee request. *See McDonough v. Toys "R" Us, Inc.*, 834 F. Supp. 2d 329, 345 (E.D. Pa. 2011) ("In the absence of any innovative terms, this factor neither weighs in favor or against the proposed fee request."); *In re Merck & Co Vytorin ERISA Litig.*, Civ. A. No. 08-285, 2010 WL 547613, at *12 (D.N.J. Feb. 9, 2010).

  **C. Lodestar Cross-check**

   "The lodestar crosscheck is intended to gauge the reasonableness of the attorneys' fee award as a whole." *Milliron v. T-Mobile, USA, Inc.*, 423 F. App'x 131, 136 (3d Cir. 2011). In performing the lodestar cross-check, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Rite Aid*, 396 F.3d at 305. The Court may then apply a multiplier to "account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *Id.* at 305-06. If the multiplier that must be used in order to obtain the result reached by application of the percentage-of-recovery method "is too great, the court should reconsider its calculation under the percentage-of-recovery method." *Id.* at 306. However, because the cross-check is not the primary analysis in common fund cases, it does not require "mathematical precision []or bean-counting." *Id.* In evaluating the hours reasonably spent on the case, the Court does not have to "review actual billing records" but can "rel[y] on summaries

26

submitted by the attorneys." *See id.*

In its motion for attorneys' fees and costs, Class Counsel claims that, between filing the first complaint in 2010, and July 2012 when it filed the motion for fees and costs, it billed 7,474 hours. (Att'ys' Fees at 9.) The Court believes that these hours are reasonable in light of the length of the proceedings, their complexity, and the extensive work completed. For example, in the *Esslinger* case, Class Counsel researched and wrote three complaints, prepared for and participated in multiple mediation sessions, conducted informal discovery which consisted of reviewing thousands of documents and interviewing two witnesses, coordinated with Defendants to write a settlement agreement, and drafted motions for preliminary settlement approval. (*See id.* at 9-11.) Class Counsel also spent additional time after July 2012 preparing for final approval of the Settlement Agreement, the fairness hearing, and subsequent briefing requested by the Court. On the basis of the extensive work done by counsel throughout a two-year period, the Court finds 7,474 hours to be reasonable.

Class Counsel calculates the lodestar to be $4,138,129.35, which would make the hourly billable rate applied approximately $554. (*See id.* at 14.) In assessing whether the hourly billable rate is reasonable, courts should apply "blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *Rite Aid*, 396 F.3d at 306. The hourly rate should be reasonable in light of "the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* at 305. The Third Circuit has favorably considered the fee schedule established by Community Legal Services when evaluating the reasonableness of a lawyer's hourly rate. *See Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir. 2001). Although the hourly billable rate requested is higher than that suggested by Community Legal Services, which offers a range of $360 to $460 for attorneys with 25 or more years experience, the Court believes that a higher hourly

billable rate is acceptable in light of the extensive experience that Class Counsel collectively shares and the complex legal services it provided. *See Chakejian*, 275 F.R.D. at 217 (determining that rates between $485 and $700 are reasonable); *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 260 (E.D. Pa. 2011) (rates between $175 and $650 are reasonable); *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 422 (E.D. Pa. 2010) (rates between $290 and $650 are "within the range charged by attorneys with comparable experience levels for consumer class action litigation"). Likewise, if the Court were to take into account the additional hours expended by counsel after July 2012, the hourly rate used to reach Plaintiffs' lodestar would be greatly reduced and likely fall within the range suggested by Community Legal Services.

Using a lodestar of $4,138,129.35, the Court's award of $7,050,000 in attorneys' fees yields an acceptable multiplier of 1.7.[3] This multiplier is acceptable for two reasons. First, the multiplier falls within the range of acceptable multipliers approved by the Third Circuit. *Prudential*, 148 F.3d at 341 (noting that multipliers from one to four are reasonable and frequently awarded in common fund cases); *see also AT&T Corp.*, 455 F.3d 160, 173 (3d Cir. 2006) (finding that 1.28 and 2.99 were acceptable multipliers). Second, although multipliers are discretionary, the circumstances of this case warrant the use of a multiplier. *See Prudential*, 148 F.3d at 340-41 (explaining that a multiplier is not required but that it "may reflect the risks of nonrecovery facing counsel, may serve as an incentive for counsel to undertake socially beneficial litigation, or may reward counsel for an extraordinary result"). The Court applies the multiplier in this case because of the high risk of non-

---

[3] Even using a heavily reduced blended hourly billable rate of $250, to account for the fact that Class Counsel likely used lawyers and personnel with varying experience and billable rates, the lodestar in this case would be $1,868,500. The resulting multiplier, 3.77, is still within the range of acceptable multipliers laid out by the Third Circuit. *See Prudential*, 148 F.3d at 341.

recovery shouldered by Plaintiffs' counsel, who worked on a contingency basis, for more than two years. For the aforementioned reasons, and based on the lodestar cross-check, the Court's award of $7,050,000 in attorneys' fees is reasonable.

## V.      SERVICE AWARDS FOR CLASS REPRESENTATIVES

The Court also approves the requested $3,500 service awards for the Class representatives. Approving service, or incentive, awards is common, especially when the settlement establishes a common fund. *See Sullivan*, 667 F.3d at 333 n.65. "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Id.*

A service award is appropriate here because of the work done and risks undertaken by the Class representatives. For example, the success of the Complaint, and likely the settlement, depended on the named Plaintiffs spending significant time searching their personal bank records for pertinent documents regarding enrollment in and administration of the Plans. (*See* Att'ys' Fees at 15.) The Class representatives also publicly disclosed personal information during this litigation, including their names, addresses, any disabilities, and details of their credit card accounts with Defendants. (*See* Second Am. Compl. ¶¶ 20-31, 64-170.) For these reasons, the Court approves an incentive award of $3,500 to be paid from the settlement fund to each Class representative.

## VI.     *CY PRES* AWARD

The settlement provides that "[a]ny balance remaining in the Settlement Fund . . . shall be

donated *cy pres* to charities mutually agreed upon by the Settling Parties and approved by the Court." (Settlement Agreement at 12.) The Court withholds judgment on approving the *cy pres* award until after it receives submissions outlining the suggested *cy pres* charities and the amount of the proposed donation.

## VII.    CONCLUSION

For the reasons stated above, the Court grants final certification of the Class, holds that the settlement is fair, adequate, and reasonable, awards Plaintiffs' counsel $7,050,000 in attorneys' fees, and $100,958.16 in costs, and awards Class representatives service awards of $3,500 each. An Order consistent with this Memorandum will be docketed separately.